UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CONSTANCE A. PRICE, as the Administratix of the Estate of COREY L. PRICE, Deceased, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:12-cv-408-RLY-DML |
| | ) | |
| THE MARION COUNTY SHERIFF'S DEPARTMENT, TED FRIES, BRIAN S. KOTARSKI, ANDREW DALSTROM, and the CITY OF INDIANAPOLIS acting by and through its Fire Department and its Metropolitan Police Department, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Constance A. Price, in her capacity as administratix of the estate of Corey L. Price, brings this civil rights lawsuit under 42 U.S.C. § 1983 and related state law claims against the Marion County Sheriff's Department ("MCSD") and the City of Indianapolis, along with Ted Fries, Brian S. Kotarski, and Andrew Dalstrom, in their individual capacities (collectively, "Defendants"). Defendants now move for summary judgment on all claims. For the reasons set forth below, the court **GRANTS** Defendants' motion.

**I.    Background**

**A. Fugitive Warrant Unit**

1

Corporal Brian S. Kotarski and Deputy Brian Dalstrom worked together in the Fugitive Warrant Unit of the MCSD.  (Deposition of Brian Dalstrom ("Dalstrom Dep.") 12:24-13:13).  This unit receives, then executes, both felony and misdemeanor arrest warrants in Marion County.  (Deposition of Brian Kotarski ("Kotarski Dep.") 10:5-11).  Relatedly, this unit responds to dispatched runs derived from anonymous tipsters or family members who have called in with information about a wanted suspect.  (Dalstrom Dep. 6:2-8).

On June 8, 2011, at approximately 2:14 p.m., Kotarski and Dalstrom received a dispatch warrant run to 3845 Cheviot Place (the "Residence") regarding an open warrant for Corey Price ("Price").  (Kotarski Dep. 12:8-15).  Price lived with Plaintiff, his mother, at the Residence.  (Deposition of Constance Price ("Constance Price Dep.") 9:20-10:7).  Price had an open warrant out of Hamilton County, Indiana for Residential Entry, a Class D Felony; Battery, a Class A Misdemeanor; and Criminal Mischief, a Class B Misdemeanor.  (Defs.' Ex. D, Hamilton County Warrant).  The control operator also sent Kotarski a photo of Price.  (Kotarski Dep. 14:23-15:1).  Price had previously been committed and taken medications for schizophrenia, but such information was not passed along to the officers.  (Constance Price Dep. 7:1-18).

Kotarski and Dalstrom drove to this address in separate unmarked vehicles.  (Kotarski Dep. 13:18-14:19).  The men parked about three to four houses east of the Residence and waited for Deputy Anthony Rotan to arrive for backup.  (Kotarski Dep. 14:7-13).  Rotan arrived in a marked MCSD car wearing his full officer uniform; Kotarski and Dalstrom were wearing "cargo type khaki pants with black raid vests with

2

'Sheriff' on [the] Velcro in the front and 'Sheriff' on the Velcro in the back." (Affidavit of Anthony Rotan ("Rotan Aff.") ¶ 4; Kotarski Dep. 15:20-25). Kotarski also wore a police badge hanging from a chain on his chest. (Kotarski Dep., 15:20-25).

### B. Price Flees Upon Seeing Officers

When approaching the Residence, the officers observed in the driveway a black male who matched the physical characteristics of Price as described in the warrant. (Dalstrom Dep. 16:19-24). Upon seeing the officers, Price ran around the back side of the house. (*Id*.). Kotarski and Dalstrom visually identified the male as Price, verbally identified themselves as law enforcement, and yelled for him to stop. (Kotarski Dep. 15:7-13, 16:12-18; Dalstrom Dep. 17:1-5). Kotarski and Dalstrom ran through the front yard to the back of the house in search of Price but could not find him. (Dalstrom Dep. 17:1-25). Meanwhile, Rotan stayed at the Residence in case Price returned. (*Id*.). Because Kotarski was unsure whether Price retreated into the house, Kotarski had Dalstrom and Rotan set up a perimeter around the house. (Kotarski Dep. 16:25-17:2). Rotan went to the back of the Residence and heard "loud banging noises" coming from inside the Residence. (Rotan Aff. ¶¶ 6-7). Rotan then notified the other officers that Price may be located inside the Residence. (*Id*. at ¶ 8).

### C. Lieutenant Hammons Approaches the Residence

During this time, Lieutenant Guy Hammons of the MCSD arrived at the Residence. (Affidavit of Guy Hammons ("Hammons Aff.") ¶ 4). Kotarski updated Hammons on the status of encounter, and Hammons approached the front of the Residence. (*Id*. at ¶¶ 4-5). As Hammons approached, Price exited the front door and

3

stood on the covered front porch.  (*Id.* at ¶ 5).  Price held a container of lighter fluid and attempted to douse Hammons with lighter fluid by projecting the fluid in his direction for about "five or ten seconds."  (*Id.* at ¶ 6; Dalstrom Dep. 22:18-22).  At this point, Hammons was approximately thirty to forty feet away and the lighter fluid carried approximately fifteen to twenty feet short of Hammons.  (Dalstrom Dep. 21:2-18). Hammons and Dalstrom yelled at Price to put his hands up and step away from the porch, but Price refused to obey.  (Hammons Aff. ¶¶ 7-8; Dalstrom Dep. 20:1-5).  Instead, Price shouted back expletives at the officers, repeatedly telling them to "go the fuck away" and to "get the fuck out."  (Dalstrom Dep. 19:11-16).  Hammons did not know if Price had any weapons or access to any weapons inside the home.  (Hammons Aff. ¶ 9).  Because of Price's hostility and attempts to douse Hammons with lighter fluid, Hammons could not advance any closer to the Residence.  (*Id.* at ¶ 10).  Moreover, Hammons could not utilize his Taser on Price due to the presence of flammable lighter fluid.  (*Id.* at ¶ 11).

### D.  Price Lights Porch On Fire

Price continued to refuse to comply with the officers' demands and instead began spraying lighter fluid over trash bags on the front porch which were filled with clothes. (Dalstrom Dep. 23:3-6; Constance Price Dep. 23:7-12).  Then, Price took a lighter or a match and threw it down on the materials, resulting in the material going up in flames. (Hammons Aff. ¶ 12; Dalstrom Dep. 23:8-15).  After the porch caught fire, Price opened the front door and went inside the house.  (Dalstrom Dep. 23:13-15).  The flames spread to the roof over the porch and the front wall of the house.  (Dalstrom Dep. 23:17-20).

### E.  Price Barricades Himself Inside the Residence

The officers next observed Price through a large picture window at the front of the Residence. (Dalstrom Dep. 23:21-24:6). Price threw a flower pot through the picture window, shattering the glass. (*Id*.; Hammond Aff. ¶ 13). The potted plant landed in the middle of the front yard, about fifteen to twenty yards from Kotarski. (Dalstrom Dep. 24:2-3; Kotarski Dep. 18:11-12). Dalstrom observed Price through the window and saw his arms were covered with blood in addition to "quite a bit of blood" on the flower pot. (Dalstrom Dep. 24:7-11). Hammons continued to order Price to exit the Residence, but Price retreated further into the home. (Hammons Aff. ¶ 14). Similarly, another deputy was making announcements over his vehicle loud speaker, stating "Sheriff's department, come out of the house." (Dalstrom Dep. 24:21-24).

Shortly after the flower pot went through the window, Dalstrom heard a "loud bang or pop" from inside the garage of the Residence, but he did not hear Price fire a gun. (Dalstrom Dep. 26:1-6). Dalstrom reported this "loud bang or pop" over the radio, but remained uncertain whether it was a gunshot. (Dalstrom Dep. 26:7-11). Specifically, the radio dispatcher stated that officers reported "shots fired into the garage" at the Residence. (Defs.' Ex. G, CAD Audio, Track 4). Likewise, Hammond also heard sounds from the garage which sounded like possible gunfire. (Hammons Aff. ¶ 15). And Kotarski heard a "loud, banging, popping noise come from the garage area." (Kotarski Dep. 21:18-20). Although Kotarski never told anyone that it was a gunshot, he did feel it was "significant enough for officer safety to let everybody know that we heard a loud popping, banging noise from the garage area." (Kotarski Dep. 21:20-25).

### F. Arrival of Indianapolis Fire Department

Firefighters from the Indianapolis Fire Department ("IFD") then began to arrive at the Residence.  (Pl's Ex. 1 to Deposition of Gerard Fries ("Fries Dep.") at 3).  The IFD initially hooked up their hoses and attempted to put water on the fire from a distance with a "deck gun."  (Fries Dep. 12:2-4, 17:7-11; Pl.'s Ex. 1 to Fries Dep. at 4).  However, because Price "possibly fired shots at uniformed deputies," the police "determined it unsafe to permit IFD to attack the fire until SWAT could render the inner perimeter safe." (Pl.'s Ex 2 to Dalstrom Dep., IMPD Supervisory Special Report).  As a result, IFD only put water on the Residence for a brief period before it stopped.  (Fries Dep. 12:2-4, 17:7-11; Pl.'s Ex. 1 to Fries Dep. at 4).

### G. Arrival of SWAT Team Captain, Major Gerard Fries

The officers at the scene requested the SWAT team for support.  (Fries Dep. 9:24-10:2).  Hostage negotiators also arrived with SWAT, but since the house was already ablaze, any attempts to communicate by phone or other means would have been futile. (Fries Dep. 21:5-18).  That said, several announcements were made from the PA system of an armored vehicle, called a BearCat.  (Fries Dep. 21:23-22:8).  When SWAT team captain, Indianapolis Metropolitan Police Department ("IMPD") Major Gerard Fries, arrived at the scene, the fire fully engulfed the Residence, with smoke "bellowing out of virtually all the windows."  (Fries Dep. 10:18-19, 16:20-21).  IMPD Lieutenant Terry Eden briefed Fries on the status of the situation, explaining that Price had set the house ablaze and they believed that "shots were fired at them" when they approached the Residence.  (Fries Dep. 14:10-15:3).  Fries spoke directly with the county representative

who was in charge of the operation – Captain Michael Hubbs – and Hubbs maintained

that he believed the officers were fired upon.  (Fries Dep. 15:9-19).

Fries also spoke to the battalion chief of the IFD, Chief Harris, to discuss how the

SWAT team could protect and assist the IFD.  (Fries Dep. 12:4-15).  Harris expressed

concern about the firefighters' safety because of the claims of shots being fired, so Fries

and Harris discussed the best way to extinguish the fire while also protecting those

firefighters.  (Fries Dep. 16:2-14).  Fries, however, never refused a request by IFD to try

to suppress the fire.  (Fries Dep. 57:4-7).

### H. Search of Garage

Officers at the scene believed Price may be in the garage – an area not yet

consumed by smoke and fire.  (Fries Dep. 17:14-18).  Officers sought a search warrant to

enter the Residence and stated in the Affidavit for Probable Cause that "A B/M inside the

residence fired a single shot at officers and then set the house on fire, refusing to

surrender."  (Pl.'s Ex. 4 to Dalstrom Dep.).  The search warrant became unnecessary,

though, when IMPD obtained consent for the search from Plaintiff.  (Fries Dep. 17:14-

23).  With help from an armored vehicle providing cover in the front yard, the police

visually inspected the garage but Price was not there.  (Fries Dep. 18:24-19:5).

After the garage had been cleared, the fire continued to burn until IFD and IMPD

concluded that it would be safe to approach the home.  (Fries Dep. 19:13-21).  Fries and

Harris continued to discuss the best ways to provide cover for the firefighters and decided

to position the BearCat in the front yard and place the hoses behind the BearCat.  (Fries

Dep. 57:23-58:17).  Finally, at 3:53 p.m., IFD began suppressing the fire and at 5:50

p.m., the fire had been extinguished.  (Pl.'s Ex. 1 to Fries Dep. at 6-7).

### I.  Discovery of Price

After the fire had been suppressed, firefighters and officers searched the

Residence, where they found Price's body in the basement.  (Defs.' Ex. I, Autopsy 3).

The body was transported to the Marion County coroner's office for postmortem

examination.  (*Id*.).  The coroner concluded that the cause of death was inhalation of soot

with carbon monoxide toxicity along with a contributory cause of superficial incised

wounds of the arms.  (*Id*. at 1).  The manner of death was ruled to be a suicide.  (*Id*.).

### J.  Arrival of Plaintiff

At some point during this conflict, Price called Plaintiff at her work.  (Constance

Price Dep. 12:14-13:8).  Price was hysterical on the phone, so Plaintiff decided to leave

work to check on him.  (Constance Price Dep. 14:8-24; Declaration of Constance Price

("Constance Price Decl.") ¶ 5).  Upon arriving at the Residence, Plaintiff noticed her

house was on fire as the porch was smoking.  (Constance Price Dep. 16:9-19).  Although

at least five fire trucks were on the scene, they were not putting the fire out.  (Constance

Price Dep. 16:11-17:14; Constance Price Decl. ¶¶ 6-7).  Officers prevented Plaintiff from

getting close to the house.  (Constance Price Dep. 17:25-18:6).  Instead, an unidentified

woman and a chaplain both alerted Plaintiff that her son had died.  (Constance Price Dep.

18:7-17).

Plaintiff alerted unidentified police officers that Price had a chemical imbalance,

but she never spoke with Fries.  (Constance Price Decl. ¶ 10; Fries Dep. 18:5-6).  At

approximately 3:17 p.m., an officer announced over the radio that Price was

schizophrenic.  (Pl.'s Ex. 1 to Fries Dep. at 4-5).  Because of Price's mental illness,

Plaintiff did not allow him to have a gun.  (Constance Price Decl. ¶ 10).  Plaintiff did,

however, own a gun in the home, but she hid it in a shoe box in her bedroom closet.

(Constance Price Dep. 22:3-22).  Plaintiff did not believe Price knew where the firearm

was located.  (Constance Price Dep. 22:3-11).

## II.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  FED.

R. CIV. P. 56(a).  A "material fact" is one that "might affect the outcome of the suit under

the governing law."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  To that

end, a genuine dispute as to a material fact exists if "there is sufficient evidence favoring

the nonmoving party for a jury to return a verdict for that party."  *Id*. at 249.

The burden is upon the movant to identify those portions of the "pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any," which the movant believes demonstrates an absence of a genuine issue

of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the movant

has met this burden, the nonmoving party may not rest upon mere allegations or denials

in its pleadings, but "must set forth specific facts showing that there is a genuine issue for

trial."  *Anderson*, 477 U.S. at 250.  Parties may assert that "the materials cited do not

establish the absence or presence of a genuine dispute," and parties may also object to the

admissibility in evidence of the material cited.  FED. R. CIV. P. 56(c)(1), (2).  In short, the

9

court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

## III.   Discussion

### A. 1983 Claims

Plaintiff brings Fourth and Fourteenth Amendment claims under Section 1983.

Section 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or so other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (citation omitted).  A plaintiff stating a claim under Section 1983 must show that: "(1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law."  *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 791 (7th Cir. 2003) (citation omitted).  The central issue is whether Price's constitutional rights were deprived as the parties do not dispute that Defendants were acting under color of law.  The court now examines these constitutional claims.

### 1.   Fourth Amendment

The Fourth Amendment provides protection for "the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S.

Const. amend. IV.  For Plaintiff to state a Fourth Amendment cause of action, she must show: (1) Defendants' conduct constituted a "seizure"; and (2) the seizure, if one occurred, was "unreasonable."  *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994).  Defendants argue that no seizure occurred and even assuming one did occur, it was not unreasonable.

### a.  Seizure

Because "pre-seizure conduct is not subject to Fourth Amendment scrutiny," the court must first determine whether Defendants' conduct constituted a seizure of Price. *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992).  Indeed, an officer's conduct may be unreasonable, unjustified, or outrageous, but it is not prohibited by the Fourth Amendment unless it involves a seizure.  *Kernats*, 35 F.3d at 1177.  The Supreme Court explained that a "person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied."  *Brendlin v. California*, 551 U.S. 249, 254 (2007) (quotation marks and internal citations omitted).  Similarly, the Seventh Circuit further clarified that a "seizure typically involves an almost complete restriction of movement – either a laying of hands or a close connection (both temporally and spatially) between the show of authority and the compliance (as when a police officer tells a suspect to get in the back of the squad car but declines to handcuff him)."  *Kernats*, 35 F.3d at 1180.

No seizure occurs, however, if an officer's show of force does not either physically touch the individual or compel him to submit to the officer's authority.

*California v. Hodari D*., 499 U.S. 621, 626-27 (1991) (finding pursuit of suspect did not constitute a seizure until suspect had been tackled since he did not comply with "show of authority" to stop).  Thus, *Hodari D* implies that "not only must the encounter meet an objective test of coercion but a subjective one of subjection."  *Kernats*, 35 F.3d at 1178 (citing *United States v. Jordan*, 951 F.2d 1278, 1281 (D.C. Cir. 1991)).  For example, a "police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned."  *Brendlin*, 551 U.S. at 254; *see also Kernats*, 35 F.3d at 1178 n.4 (recognizing that under the *Hodari D* test, "a fleeing suspect – even one who is confronted with an obvious show of authority – is not seized until his freedom of movement has been terminated by intentional application of physical force or by the suspect's submission to the asserted authority").

The Seventh Circuit has not ruled on whether a seizure has occurred under the Fourth Amendment on the basis of officers surrounding a barricaded subject. Nevertheless, the Seventh Circuit has generally set forth a two-part test to determine whether a seizure has taken place: (1) if physical force was used along with a show of authority; and (2) if the person submitted to the show of authority.  *McCoy v. Harrison*, 341 F.3d 600, 605 (7th Cir. 2003) (interpreting *Hodari D*).  In other words, Plaintiff must not only show that Price's liberty has been restrained, but also that Price "actually yielded to a show of authority."  *See id.* (quoting *Hodari D*, 499 U.S. at 629).

The Court implemented this test in *Cabell v. Rousseau*, where an arrestee sued police officers under a Fourth Amendment claim of excessive force.  130 Fed. Appx. 803

12

(7th Cir. 2005).  This claim stemmed from SWAT storming into an arrestee's residence and a shootout then ensuing between the arrestee and officers.  *Id.*  The Court found no seizure occurred because the arrestee "was not struck by the officers' bullets, and he did not submit to their authority until the firing had ceased – to the contrary, he responded to their shots by returning fire of his own.  He therefore was not seized, and could not have been the victim of excessive force."  *Id*. at 807; *see also U.S. v. $32,400.00, in U.S. Currency*, 82 F.3d 135, 139 (7th Cir. 1996) (finding no seizure where officers surrounded vehicle but the driver eluded the officers and engaged in a high speed chase because the driver's freedom of movement was not terminated; thus, it only constituted a "strong but unsuccessful attempt to stop [the driver]"); *McCoy*, 341 F.3d at 605 (finding no seizure occurred where plaintiff's freedom of movement was not restrained and she did not in any way submit to a show of authority).

Here, it is clear, officers were showing authority by surrounding the Residence, but the issue is whether Price ever submitted to the officers' authority.  He did not.  Instead, Price (1) attempted to flee the scene upon the officers' arrival; (2) shouted obscenities at the officers; (3) refused many commands to exit the house; (4) sprayed lighter fluid at an officer; (5) lit the Residence on fire; and (6) threw a potted plant at the officers.  None of these actions show Price actually yielding to this authority.  Indeed, if Price ever did in fact yield to police authority, then he would have been safely removed from the Residence.

Nonetheless, Plaintiff relies on the hypothetical set forth in *Kernats* in arguing that a seizure occurred.  The Seventh Circuit hypothesized:

> [A]ssume that a group of armed officials, guns drawn, surrounds a citizen in the doorway of her office and threatens to kill her.  If that citizen then retreats into her office, locking the door and perhaps barricading it as well, it would be reasonable to conclude that she has been seized although no one laid hands on her.  It is enough that as a result of a prominent show of authority she was immediately confined to a small space with no viable means of otherwise terminating the encounter.

*Kernats*, 35 F.3d at 1180.  The Court further explained that this scenario involved "immediate threats made by persons physically present who were ready and able to carry them out, *leaving no room for appeal, evasion, or compromise*."  *Id*. (emphasis added).

As a preliminary matter, this clearly is dicta and is not binding on this court.  But even if it were binding precedent, the facts here can be distinguished.  First, the area in which the subject is restricted is much smaller in the hypothetical than as present here.  While *Kernats* involves an office with officers just outside the doorway, Price was "restricted" to the entire Residence and its surrounding curtilage.  Moreover, instead of being directly outside Price's location, officers were stationed much farther away because of the safety risks Price posed.  This is a critical distinction because the Seventh Circuit explained that "[a]s the extent of the limitation on a person's desired movement decreases, so too does the likelihood that even coercive police action will give rise to a seizure."  *Id*.

Here, Officers did not limit Price's desired movement to give rise to a seizure; instead, Price freely moved from the driveway, to the backyard, to inside the house, to the front porch, and ultimately, to the basement.  Although Price may have been restricted to a confined area, at no point did he submit to the authority of the officers or have his

movement severely limited.  Indeed, room still existed for Price to appeal, evade, or compromise, and he attempted all three, as he shouted expletives at officers, attempted to flee, and threw objects at the officers.  The hypothetical in *Kernats* is not on point.

Plaintiff also heavily relies on *Escobedo v. City of Fort Wayne*.  No. 1:05-cv-424, 2008 WL 1971405 (N.D. Ind. May 5, 2008), *aff'd sub nom. Estate of Escobedo v. Bender*, 600 F.3d 770 (7th Cir. 2010).  There, the Northern District of Indiana examined whether a seizure occurred where a mentally ill man called 911 and told the dispatcher that he (1) had a gun, (2) would shoot himself, (3) was using drugs, and (4) feared police would shoot him even though he incorrectly believed they were present.  *Id.* at *3.  Police arrived at the scene and hostage negotiators spoke with the suspect for several hours.  *Id*. at *4-6.  Because police believed that negotiations were not going anywhere, they fired tear gas canisters into the apartment and then stormed inside.  *Id*. at *9.  Ultimately, the officers located the suspect hiding in a bedroom closet with a gun and fired upon him when he would not surrender.  *Id*. at *16-17.

The issue for the district court concerned the point of seizure -- when the police surrounded the suspect's apartment with weapons drawn or when he had been shot.  *Id*. at *18.  The district court found these facts to be similar to the hypothetical proposed in *Kernats* and held that the suspect "yielded or submitted because he was unable to move about as he wished as a result of the police intentionally applying means (officers, [Emergency Response Team], armored car, tear gas) to restrain his freedom of movement."  *Id*. at *23.  The district court said this behavior amounted to "when an

15

individual's submission to a show of governmental authority takes the form of passive acquiescence." *Id*. (citing *Brendlin*, 551 U.S. at 255). As a result, the district court found a seizure occurred when the police barricaded the subject. *Id*.

*Escobedo* can easily be distinguished from the facts here. First, the magnitude and length of response by the police in *Escobedo* far dwarfs the response at issue here. The standoff in *Escobedo* lasted for hours, with extensive negotiations, and ultimately led to police entering the apartment by force. By contrast, Price never engaged in controlled talks but instead shouted obscenities, hurled projectiles, and lit the house on fire. Because of this defiant behavior, police were never able to enter the Residence. At bottom, Price's behavior was anything but a form of "passive acquiescence"; rather, he actively resisted arrest.

Moreover, Price's situation involved an intense, unstable environment which lasted a fraction of the time in *Escobedo*. The court in *Escobedo* even noted this extended time period in distinguishing *Cabell*, stating that *Cabell* had "significant factual differences" because "police entered the home within seven seconds of the start of the raid, the plaintiff shot at the officers and hit two of them, and the plaintiff surrendered several moments after that." *Id*. at *20 n.5. The quick, contentious conflict in *Cabell* is much more analogous to Price's encounter than the drawn-out affair in *Escobedo*. Thus, *Escobedo* is not persuasive for a seizure occurring here. Accordingly, the court finds as a matter of law that Price was not seized for purposes of the Fourth Amendment.

**b.  Reasonableness**

16

Even assuming, *arguendo*, that Price had been seized, Plaintiff must also show that Defendants' conduct was unreasonable.  Although Defendants had probable cause to arrest Price based on the arrest warrant, the existence of probable cause does not affect Plaintiff's excessive force claims because "the reasonableness of an arrest or other seizure under the Fourth Amendment depends not only on *when* it is made but also on *how* it is made."  *Abbott v. Sangamon County, Ill.,* 705 F.3d 706, 724 (7th Cir. 2013) (citing *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985)).  In other words, "even when an officer has probable cause to arrest, the Fourth Amendment prohibits him from employing 'greater force than [is] reasonably necessary to make the arrest.'"  *Id.* (citing *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009)).  Accordingly, we examine the reasonableness of Defendants' actions.

"[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen, should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."  *Graham*, 490 U.S. at 395.  This reasonableness standard does not have a "precise definition or mechanical application," but instead the court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Id*. at 395-96.  This inquiry is an objective one, as "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id*. at 397.  Consequently, an "officer's evil intentions will not make a Fourth

Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id*.

Importantly, "the 'reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396.  That is, the court should begin its analysis from "the moment the officers arrived on the scene in order to place the officers' conduct in context." *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997).  The court must keep in mind that "[n]ot every push or shove [is unreasonable], even if it may later seem unnecessary in the peace of a judge's chambers." *Graham*, 490 U.S. at 396; *see also Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003) ("Under the Constitution, the right question is how things appeared to objectively reasonable officers at the time of the events, not how they appear in the courtroom to a cross-section of the civilian community").  This is because the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id*. at 396-97.

The Supreme Court articulated several factors to consider in deciding whether conduct was unreasonable, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.  Additionally, the court may consider mental illness in this calculus. *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007).  The court now examines these factors.

### i.     Immediate Threat to the Safety of the Officers or Others

First, the central issue here is whether Price posed an immediate threat to the safety of the officers or others.  The evidence is undisputed that Defendants encountered an unstable environment with objects and flammable liquids being thrown their way.  Then, multiple officers heard a popping or banging sound of some kind inside the garage.  (Dalstrom Dep. 26:1-11; Hammons Aff. ¶ 15; Kotarski Dep. 21:16-23).  Though none were certain, each thought that the sound could have possibly been gunfire.  One officer felt the need to notify other officers because of the risk it created towards officer safety.  (Kotarski Dep. 21:20-23).  Based on Price's erratic behavior and the officers' observations, it was not unreasonable that Defendants believed Price posed an immediate threat to others and may have had a gun inside the Residence.  *See Baird v. Renbarger*, 576 F.3d 340, 342 (7th Cir. 2009) (stating that courts "give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations").

Nevertheless, Plaintiff argues that Price posed no threat towards the officers because Defendants' speculation that Price possessed a gun proved incorrect.  This argument is precisely the kind of hindsight 20/20 argument which *Graham* intended to prevent.  *See Bell*, 321 F.3d at 640 (stating "it is easy in retrospect to say that officers should have waited, or should have used some other maneuver – these propositions cannot be falsified – but *Graham* makes it clear that the Fourth Amendment does not require second-guessing if a reasonable officer making decisions under uncertainty and

the press of time would have perceived a need to act").  Accordingly, the court will not alter its analysis based on Price not actually having a gun.

Even assuming it was unreasonable to assume shots were fired, it would not have been unreasonable for the fire department and police to hold off entering the home.  The suspect had actively resisted arrest and lit his own Residence on fire.  It would be logical for Defendants to fear for their own safety if they approached the Residence.  This is reinforced by Plaintiff's own brief which states, "Had Defendants properly apprehended the facts they would probably not have sent firemen inside the house to fact [sic] a belligerent schizophrenic."  Of course, Plaintiff then claims other actions should have been taken in lieu of entering the home, but she does acknowledge that the situation threatened officers' safety.

Similarly, information provided by Plaintiff about Price's schizophrenia and not owning a gun does not change the totality of circumstances.  First, it is not clear when and to whom Plaintiff told this information and, in turn, what those officers did with it. Indeed, Fries never spoke with Plaintiff.  (Fries Dep. 18:5-6).  Moreover, Plaintiff's argument is undercut by her own testimony.  She testified that *upon arrival*, she talked to a woman and a chaplain who told her that her son was dead.  (Constance Price Dep. 18:7-17).  As a result, even assuming Lieutenant Fries had any knowledge of this information – which he did not – it would have been useless since Price was already dead.[1]

_____

[1] The court also notes that even if Defendants knew this information immediately, it would not have changed the reasonableness calculus.  Information about Price's mental illness would not present Price as any less of a threat considering his prior actions.  If anything, such information would increase the threat to officer safety due to Price's unstable mental state.  *See Estate of*

### ii.   Actively Resisting Arrest or Attempting to Evade Arrest by Flight

Price actively resisted arrest through both flight and force, thus requiring some type of force to serve the warrant.  Upon seeing the police, Price sprinted from the driveway despite police identifying themselves and demanding him to stop.  After his attempt to flee proved futile, Price sprayed lighter fluid at an officer and threw a potted plant through a window towards a group of officers.  And lastly, Price set the porch on fire, creating the ultimate barrier between him and the Defendants.  Though Plaintiff disputes the effectiveness of these tactics, she does not dispute them occurring.  In sum, these actions created a tense, unstable environment in which a reasonable use of force was necessary.  *See Fitzgerald v. Santoro*, 707 F.3d 725, 734 (7th Cir. 2013) (stating the Seventh Circuit has "repeatedly upheld officers' use of force in the face of suspects resisting arrest").

### iii.   Severity of the Crime at Issue

Finally, the severity of the crime at issue may have been low risk initially, but the situation quickly escalated due to Price's malfeasance.  Although the open warrant for Price only topped out at a class D felony, the charges did involve physical violence.  And had Price survived, the police could have added charges of resisting arrest and arson to

---

*Smith v. Marasco*, 318 F.3d 497, 516-17 (3d Cir. 2003) (finding officers' knowledge of plaintiff's mental illness or instability supported use of force).  Similarly, Plaintiff's claim that Price did not own a gun would not lessen the potential threat when officers had observed his violent behavior and heard noises sounding like gunfire.  Indeed, just because Plaintiff did not think Price owned a gun would not guarantee he had not obtained a gun without her knowledge. In fact, Plaintiff stored a gun inside the Residence without Price's knowledge.  (Constance Price Dep. 22:3-22).  Thus, Plaintiff's information would not have altered the perceived threat that Price presented.

those pending charges.  Defendants may have expected, or at least hoped, for the simple service of a warrant, but Price created an environment where the severity of the charges in the warrant was no longer paramount.  Instead, it transformed into a police standoff, with Price refusing to go willingly or quietly, and thus necessitating reasonable force.

Based on these factors, the court concludes that the force used by Defendants was not unreasonable under the Fourth Amendment.  Summary judgment is appropriate here because no factual disputes are present.  Indeed, parties agree to the principle facts in this case; the only incongruities lie in what actions should have been taken by Defendants based on those facts.  This is not sufficient to survive summary judgment because "when material facts (or enough of them to justify the conduct objectively) are undisputed, then there would be nothing for a jury to do except second-guess the officers, which *Graham* held must be prevented."  *Bell*, 321 F.3d at 640 (stating that since *Graham*, the Court has "regularly treated the reasonableness of force as a legal issue, rather than an analog of civil negligence").  Accordingly, the court finds Defendants' conduct was not unreasonable and thus grants Defendants' motion for summary judgment on Plaintiff's Fourth Amendment claim.

### 2.  Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." Under the Fourteenth Amendment, two types of substantive due process violations may occur: (1) when the state actor's conduct is such that it "shocks the conscience" and (2) when the state actor violates an identified liberty or property interest protected by the Due

Process Clause. *T.E. v. Grindle*, 599 F.3d 583, 589 (7th Cir. 2010). To the latter, the Supreme Court has recognized a liberty interest in the right to bodily integrity. *Albright v. Oliver*, 510 U.S. 266, 272 (1994); *see also Wudtke v. Davel*, 128 F.3d 1057, 1062 (7th Cir. 1997) (finding a "liberty claim of a right to bodily integrity is . . . the type of claim that has often been recognized as within substantive due process"). Here, Plaintiff contends that Defendants violated Price's right to bodily integrity by withholding fire suppression.

A state actor violates the Constitution "[w]hen a state actor's deliberate indifference deprives someone of his or her protected liberty interest in bodily integrity." *Grindle*, 599 F.3d at 591. However, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). Indeed, the "Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Id*. In other words, the purpose of the Clause is to "protect the people from the State, not to ensure that the State protected them from each other." *Id*. at 196. As a result, a "State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id*. at 197.

Price's death stemmed directly from "private violence" and thus under this general rule his death does not constitute a violation of the Due Process Clause. Price created the dangerous situation by fleeing the police, dousing the porch of the Residence with lighter fluid, setting the Residence on fire, and refusing to exit despite the toxic conditions.

23

Defendants neither played a role in any of those events nor exacerbated their tragic consequences.  (*See* Fries Dep. 57:8-17 (testifying that police officers did not fire anything into the Residence)).   Accordingly, Defendants had no affirmative duty to protect Price from self-inflicted harm.

That does not end the inquiry, though, as the Seventh Circuit has noted two exceptions to this general rule.  *Jackson v. Indian Prairie School Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011).  The first exception occurs "when the state has a 'special relationship' with the citizen, such as when it takes the person into custody or otherwise imposes limitations on the person's 'freedom to act on his own behalf.'"  *Grindle*, 599 F.3d at 589; *see also DeShaney*, 489 U.S. at 200 (noting that the State may restrain an individual's freedom to act on his own behalf "through incarceration, institutionalization, or other similar restraint of personal liberty").  In such situations, "the Constitution imposes upon [the State] a corresponding duty to assume some responsibility for [a person's] safety and general well-being."  *DeShaney*, 489 U.S. at 199-200.  The second exception, known as the "state-created danger doctrine," arises "when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced."  *Jackson*, 653 F.3d at 654.  Plaintiff's argument focuses on the first exception, again arguing that Price was in custody and thus a special relationship was created.

As discussed in great detail above, Defendants never seized Price at any time during the altercation.  Price freely moved throughout the Residence and at no time

submitted to police authority.  Consequently, no special relationship was created, and an exception does not apply to the constitutional bar for private violence.

Even if a seizure had taken place, the exception still would not apply as "not every seizure equates with custody."  *Henson v. Thezan*, 717 F. Supp. 1330, 1334 n.3 (N.D. Ill. 1989) (discussing the differences between a seizure and custody).  As discussed above, a person is "seized" when, "by means of physical force or a show of authority, [an individual's] freedom of movement is restrained"; by contrast, custody requires "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980); *California v. Beheler*, 463 U.S. 1121, 1125 (1983).  Thus, custody requires a greater restraint of movement than seizure.

Such restraint did not occur here.  Price could not be considered formally arrested or to the degree associated with a formal arrest when he actively resisted arrest and continued to create barriers to his arrest.  If he were considered under arrest at that point, it would create almost limitless bounds of when a fleeing suspect is deemed under arrest. Moreover, Price's situation does not fit the policy behind the custodial exception – that is, to protect the individual "because no alternative avenues of aid exist."  *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009).  Here, Price had alternatives to prevent his demise: surrender immediately, refrain from starting the fire, or exit the burning Residence.  He chose none of the above.  Price's refusal to take available actions

does not impose a duty on Defendants.  For these reasons, the court grants Defendants' motion for summary judgment on the Fourteenth Amendment claim.[2]

### B.  State Law Claims

The court has dismissed all federal claims and now must determine whether it will take supplemental jurisdiction over the remaining state law claims.  A "district court may decline to exercise supplemental jurisdiction over pendant state law claims if the court has dismissed all claims over which it has original jurisdiction."  *Kennedy v. Schoenberg, Fisher, & Newman, Ltd.*, 140 F.3d 716, 727 (7th Cir. 1998).  A district court may decide the merits of a state law claim if the claim does not present any "novel or unsettled questions" of state law, *Binz v. Brandt Const. Co., Inc.*, 301 F.3d 529, 532 (7th Cir. 2002), or the appropriate disposition of the claim is "crystal clear," and it is "otherwise efficient to do so."  *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.,* 277 F.3d 882, 896 (7th Cir. 2001).  As the Seventh Circuit explained, "If . . . an interpretation of state law that knocks out the plaintiff's state claim is obviously correct, the federal judge should put the plaintiff out of his misery then and there, rather than burdening the state courts with a frivolous case."  *Van Harken v. City of Chi.*, 103

---

[2] Because the court has determined that no constitutional violation occurred, it is unnecessary to consider Defendants' argument for a qualified immunity defense.  *See Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1328 (7th Cir. 1993) (Easterbrook, J., concurring) ("once we conclude . . . that the individual defendants respected [the plaintiff's] constitutional rights[,]" the case is over and it is unnecessary to determine whether a defendant is entitled to qualified immunity).

F.3d 1346, 1354 (7th Cir. 1997).  In a matter of efficiency, the court now turns to the remaining state law claims of negligence and wrongful death.[3]

### 1. Immunity

Defendants contend they are immune from all state law claims under the Indiana Tort Claims Act ("ITCA").  The ITCA "allows suits against governmental entities for torts committed by their employees but grants immunity under the specific circumstances enumerated in Indiana Code section 34–13–3–3."  *Mangold ex rel. Mangold v. Indiana Dep't of Natural Res.*, 756 N.E.2d 970, 975 (Ind. 2001).  Immunity under the ITCA is a question of law for the court, and the party seeking immunity has the burden of proof.  *Catt v. Bd. of Comm'rs of Knox Cnty.*, 779 N.E.2d 1, 3 (Ind. 2002).  The court should construe this immunity narrowly, however.  *City of Anderson v. Weatherford*, 714 N.E.2d 181, 184 (Ind. Ct. App. 1999).

Defendants argue that they are immune from liability based on the following provision: "A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from . . . the adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations) . . . unless the act of enforcement constitutes false arrest or false imprisonment."  Ind. Code § 34-13-3-3(8).  Specifically, Defendants claim they are immune from liability "for their decision to not enforce the law by attempting to arrest a fleeing subject by entering a burning building after him."  Plaintiff does not dispute that the Defendants acted within

---

[3] Plaintiff dropped her claim for intentional infliction of emotional distress in her response to this motion.

the scope of their employment; rather, Plaintiff argues that law enforcement immunity

does not apply because Defendants utilized excessive force.

Plaintiff is correct that "the use of excessive force is not immunized under Indiana

law." *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1104 (S.D. Ind. 2008) (citing

*Kemezy v. Peters*, 622 N.E.2d 1296, 1297 (Ind. 1993) (stating "the use of excessive force

is not conduct immunized by [the ITCA]")).  Indiana courts use the same Fourth

Amendment objective reasonableness standard discussed above to determine whether

excessive force was used and thus gave rise to tort liability not immunized by the ITCA.

*O'Bannon v. City of Anderson*, 733 N.E.2d 1, 3 (Ind. Ct. App. 2000).  Thus, the same

conclusion is relevant here -- the force used against Price was not excessive.  *See supra*

Section III.A.1.b.  Accordingly, Defendants are immune under the ITCA, and

Defendants' motion is granted as to all remaining state law claims.[4]

## IV.   Conclusion

For the reasons set forth above, Defendants' motion for summary judgment

(Docket # 37) is **GRANTED**.


**SO ORDERED** this 23rd day of September 2013.

_____
RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.

_____

[4] It is unnecessary to reach Defendants' arguments as to common law immunity and contributory negligence.   The court only notes that these also may have provided plausible grounds for granting summary judgment.

28